## UNITED STATES BANKRUPTCY COURT
## FOR THE
## FOR THE DISTRICT OF MASSACHUSETTS

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

In re |
**BOSTON LANGUAGE INSTITUTE, INC.,**        Chapter 11
     Debtor                      Case No. 18-12508-JNF

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

### MEMORANDUM

## I. INTRODUCTION

The matter before the Court is the Motion of RREF II Kenmore Lessor II, LLC ("RREF") for Relief from Stay to Proceed with Summary Process Eviction (the "Stay Relief Motion"). RREF, a Massachusetts limited liability company and an affiliate of Related Beal, supported its Stay Relief Motion with the Affidavit of Will Grosvenor, a Director and General Manager for Related Beal, a real estate development and management company, which, through affiliated companies, owns commercial real estate throughout the region, including 648 Beacon Street, Boston, Massachusetts where Boston Language Institute, Inc. (the "Debtor") operates its business as a tenant under a written Lease for premises, defined as "[t]he entire third (3rd) floor" of "One Kenmore Centre, 642-648 Beacon Street, Boston, Massachusetts (the 'Building')." It seeks relief from the automatic stay pursuant to 11 U.S.C. § 362(d)(1) and (d)(2).[1]

---

[1] RREF also relied upon 11 U.S.C. § 362(b)(10), which excepts from the automatic stay "an act by a lessor to the debtor under a lease of nonresidential real property that has terminated by the expiration of the stated term of the lease before the commencement of or during a case under this title to obtain possession of such property." The Court

The Court heard the Stay Relief Motion on August 17, 2018. At that time, the Court deemed the Stay Relief Motion and the Debtor's Opposition a contested matter under Fed. R. Bankr. P. 9014 to which the adversary rules apply, and scheduled an evidentiary hearing for September 20, 2018. At the conclusion of the evidentiary hearing held on September 20, 2018, the Court directed the parties to submit proposed findings of fact and rulings of law. In addition, RREF stated on the record that it waived its rights under 11 U.S.C. § 362(e)(1).

The issue presented by the Stay Relief Motion is whether RREF has established that it, in fact, intends to "substantially rehabilitate all or any substantial portion of the Building (two or more floors)" containing the Debtor's leased premises pursuant to a "Notice of Termination of Lease and Tenant's Right to Possession" dated June 28, 2017, 2017. In its Stay Relief Motion, it stated that it had determined "to renovate the premises and building, specifically, the First, Second, and Third Floors," although it also stated that "[i]t has been planned that space on the Third Floor [occupied by the Debtor] will house a site construction and sales office for premises owned by Related Beal or its affiliates." The Debtor, in its Opposition, denied that RREF is planning "substantial rehabilitation" referencing the records of the Boston Redevelopment Authority in which RREF and Related Beal represented that they planned "modest modifications."

---

determined, prior to the evidentiary hearing that that section is inapplicable to the present dispute.

Upon consideration of the evidence presented and the submissions of the parties, the Court now makes its findings of fact and conclusions of the law pursuant to Fed. R. Bankr. P. 7052.

## II. FACTS

The Debtor commenced a Chapter 11 case on June 29, 2018.  On July 19, 2018, it filed its schedules of assets and liabilities, and Statement of Financial Affairs.   On Schedule A/B: Assets – Real and Personal Property, it listed a leasehold interest at 348 [sic] Beacon Street, Boston, MA, disclosing that the leasehold contained approximately 7,745 square feet of space and that the Lease expires December 31, 2020.  The Debtor indicated that the value of the Lease was "Unknown."  On Schedule E/F, it listed Trustees of Boston University ("Boston University") as the holder of a claim in the sum of $13,535. The Debtor did not not list Boston University or RREF on Schedule G:  Executory Contracts and Unexpired Leases.

On October 10, 2018, the Debtor filed an Emergency Motion to Extend Time to Assume or Reject Lease of Non-Residential Real Estate.  On October 12, 2018, the Court entered the following order:

> Upon consideration of the RREF II Kenmore Lessor II, LLC's Motion for Relief from Stay to Proceed with Summary Process Eviction, which motion is under advisement following an evidentiary hearing, the Court hereby overrules RREF II Kenmore Lessor II, LLC's Objection to the Emergency Motion and grants the Debtor's Emergency Motion in part. The Court extends the time within which the Debtor may assume or reject its lease with RREF II Kenmore Lessor II, LLC's until December 21, 2018.

RREF and the Debtor are parties to a written Lease which Lease originally was between One Kenmore Centre Limited Partnership ("One Kenmore") as Landlord and

the Debtor as Tenant for premises at the One Kenmore Centre located at 642-648 Beacon Street, Boston (the "Premises").  The Building at 642-648 Beacon Street contains six floors and the Debtor's Premises includes the entire third floor as well as "adjacent sidewalks . . . together with the right to use in common, with others entitled thereto, the hallways, stairways, and elevators, necessary for access to the Premises."  The ground floor of the Building contains three entrances, one at 648 Beacon Street which is used primarily for offices located on the second through sixth floors, as well as for Back Bay Publishing, and the two other separate entrances, one for the former Bruegger's Bagels space and the other for the former Amsterdam Falafelshop space at 646 and 642 Beacon Street, respectively.

On December 13, 2007, One Kenmore's successor and RREF's predecessor-in interest, Trustees of Boston University ("Boston University"), and the Debtor entered into a First Amendment to Commercial Lease.  The First Amendment to Commercial Lease provided in paragraph 3 the following:

LANDLORD'S TERMINATION OPTION

Notwithstanding any other provision of the Lease to the contrary, if Landlord determines *to demolish or substantially rehabilitate all or any substantial portion of the Building (two or more floors),* Landlord may elect to terminate the Lease as of any date by giving Tenant written notice of such election no later than twelve (12) months before the effective date of such termination, which shall be specified in Landlord's notice.  If Landlord so elects, then this Lease shall terminate on such specified date with the same force and effect as if such date were the date originally designated for the expiration of the Lease term.

(emphasis supplied).  On May 5, 2009, Boston University and the Debtor entered into a Second Amendment to Commercial Lease.  On December 26, 2012, Boston University and

4

the Debtor entered into a Third Amendment to Commercial Lease.  On October 30, 2015, Boston University and the Debtor entered into a Fourth Amendment to Commercial Lease, which provided:  "The Term of the Lease is hereby extended for an additional five (5) year term commencing January 1, 2016 and expiring December 31, 2020 ('Third Extension Term').  Tenant has no further option to extend the Lease."  In addition, pursuant to the Fourth Amendment to Commercial Lease, "Landlord and Tenant . . . explicitly acknowledge[d] that the termination options of Landlord and Tenant in the First Amendment to Commercial Lease remain in effect."

By virtue of written assignments of Lessor's interest in the Lease, RREF is successor-in-interest to Landlord's interest in the Lease for the Premises, which are currently occupied by the Debtor.

RREF and 642 Beaconaf, LLC d/b/a the Amsterdam Falafelshop were parties to a lease dated April 1, 2014, demising approximately 2,010 square feet of space located at 642-648 Beacon Street, Boston, Massachusetts.  On February 10, 2017, RREF and 642 Beaconaf, LLC entered into a Lease Termination Agreement with the lease termination effective on the date of the agreement.

On May 22, 2017, RREF, through counsel, sent a Notice to Quit to Back Bay Publishing in which it stated:  "notice is hereby given to you of the termination of your tenancy as a month-to-month Tenant-At-Will [for premises at 648 Beacon Street] and you are requested to surrender, deliver up, and quit the Premises no later than June 30, 2017, as the expiration of that month of your tenancy which shall begin next after this date.  Failing such vacating, legal action shall be commenced to evict you."

On May 22, 2017, RREF, through counsel, sent a Notice of Termination to Bruegger's Enterprises, Inc., in which it stated:  "Pursuant to Section 4 of the Fourth Amendment to Lease [covering premises at 642-648 Beacon Street], and in connection with Landlord's intention to substantially renovate the Building, Landlord hereby gives notice to Tenant of Landlord's election to terminate the Lease effective November 30, 2018."[2]

On June 28, 2017, RREF, through counsel, sent to the Debtor a "Notice of Termination of Lease and Tenant's Right to Possession.  The notice provided:

> Pursuant to Section 3 of the First Amendment to Commercial Lease dated December 13, 2007, and in connection with Landlord's determination to substantially rehabilitate the Building, Landlord hereby gives written notice of its election to terminate the Lease, effective June 30, 2018.  This notice supersedes the notice previously sent to you on or about May 22, 2017.

On January 26, 2018, RREF's affiliate Related Beal sent to the Boston Redevelopment Authority a "Letter of Intent with Respect to Kenmore Square North Redevelopment, Boston MA."  The Letter provided in pertinent part the following:

> Related Beal, LLC, on behalf of RREF II Kenmore Lessor I LLC, RREF II Kenmore Lessor II LLC, RREF II Kenmore Lessor III LLC and RREFF II Kenmore Lessor IV LLC (collectively the "Proponent"), submits this letter as a Letter of lntent filed in accordance with the Executive Order Relative to the Provision of Mitigation by Development Projects in Boston. The Proponent intends to undertake the redevelopment of the Project Site (defined below), located in the heart of Kenmore Square with frontage on Deerfield Street, Commonwealth Avenue and Beacon Street, into a vibrant mix of commercial uses, including office, retail, and restaurant (the

---

[2] Section 4 of the Lease is similar to the section 3 in the First Amendment to the Debtor's Lease except that the Landlord was required to give "written notices of such election not later than eighteen (18) months before the effect date of such termination" and there was no mention of "two or more floors."

"Proposed Project"). The Proponent has entered into long-term ground leases from the Trustees of Boston University ("Boston University") for the following properties: 11-19 Deerfield Street ("Building l"); 541, 535-539, and 533 Commonwealth Avenue ("Buildings 2, 3, and 4"); 660, 656, 652-654 and 650 Beacon Street ("Buildings 5 , 6, 7, and 8"); and 642-648 Beacon Street ("Building 9") (collectively Buildings 1-9 and attendant areas comprise the "Project Site").

The approximately 1.4-acre Project Site currently contains approximately 310,000 square feet devoted to office, institutional, retail, and restaurant use, with some vacancy, within nine structures ranging from two to six stories each. The Project Site is uniquely situated along two of Boston's key thoroughfares, Beacon Street and Commonwealth Avenue, adjacent to the Kenmore Square transit hub, the gateway to Boston University's campus, the Fenway Park area and the historic Back Bay.

The Proposed Project as currently envisioned includes: *(1) modest modifications to Buildings 1 and 9 to provide improvement to the streetscape as well as interior improvements to the office and commercial retail/restaurant spaces;* (2) redevelopment and repurposing of Buildings 5-8 which will contain office/creative workspace with ground-floor retail/restaurant uses while maintaining the Citgo  sign that sits atop Building 5, which is the subject of Boston Landmarks Commission review; (3) construction of a new, approximately 165,000 square foot, 8-story building located where Buildings 2-4 currently exist, which will include a mix of commercial retail/restaurant uses on the ground floor and mezzanine levels, with office use above, together with below grade parking and uses accessory thereto; and (4) provide improvements to the streetscape and public realm throughout the project site to enhance the pedestrian experience in Kenmore Square. The Proponent will serve as developer, obtaining relevant zoning and land use entitlements for the above-described Project as a whole, and will insure that the Project is consistent with an overall development plan by virtue of compliance with these entitlements. If and to the extent appropriate, certain of the modest modifications to the existing buildings may be undertaken on a parallel track with the ongoing review process.

The Project Site is located within the B-4 (General Business) Zoning Subdistrict of the Boston Proper Zoning District, the Groundwater Conservation Overlay District, and the Restricted Parking Overlay District. Building l, located at 1 l-19 Deerfield, is also located within the BU Institutional Master Plan Overlay District and within the Bay State Road/Back Bay West Architectural Conservation District. The Proponent

will obtain the appropriate zoning relief for the Project as a whole, while enabling each of the components described above to be developed individually, coordinating with the review by the BPDA and other City Agencies to the extent required. The Proponent will also seek other permits and approvals, if and as required, including coordination of review by the Boston Landmarks Commission and Bay State Road/Back Bay West Architectural Conservation District Commission and staff as appropriate. The Proponent intends to submit a Project Notification Form to initiate review of the Proposed Project in accordance with Article 80B of the Code within the next few months. The Proponent will also seek to establish a Planned Development Area to encompass the Project Site in accordance with Article 8OC of the Code, to obtain the zoning relief as necessary for the Project.

(emphasis supplied).

On March 1, 2018, Prellwitz Chilinski Associates, Inc. ("PCA"), an architectural firm sent an "Architectural Firm Proposal" to Related Beal's Project Manager, Design, Steven Ng, for architectural design services related to "Phase 1 at Kenmore Square. With respect to Building 9, the proposal provided:

The project includes base building common area interior finish upgrades of a 6-story 49,019 SF existing building. *Scope of work is strictly updating finishes and overall clean-up of interiors* as outlined in accompanying diagrams, and will include:

▪Elevator cab interior finish upgrades
▪Evaluate and propose interior design and finishes for the main lobby, upper lobbies and corridors only
▪Evaluate and propose interior design and finishes for existing shell/core bathrooms
▪*No alterations or updates to existing tenant spaces*
▪*No alterations or updates to the building exterior*
▪Assist with furniture specifications and procurement as need for lobby
▪Design and detailing of any required millwork
▪Assist client in developing Landlord Tenant Scope Matrix

(emphasis supplied).

8

On May 4, 2018, Roux Associates, Inc. ("Roux") issued a Proposal to Related Beal "to complete a Comprehensive Building Material Survey (Comprehensive Survey) at the building located at 541, 537 and 533 Commonwealth Avenue in Boston, Massachusetts, referred to herein in this proposal as Building 9.   Building 9 is one of nine buildings purchased in 2016 from Boston University."   Building 9 was a reference to 648 Beacon Street.

On May 24, 2018, RREF and Joint Ventures Physical Therapy, Inc. ("JVPT") (now located at 654 Beacon Street) executed a Letter of Intent.   The proposed Lease Agreement was for the premises located at 642-648 Beacon Street, comprised of 3,750 +/- square feet on the 2nd floor of the Building.   The initial term of the lease was for ten years with two optional terms of five years each.   JVPT agreed to and accepted the terms set forth in the Letter of Intent.   A draft of an Office Lease Agreement between RREF and JVPT provided at paragraph 3.01 the following:

> Term. The "Term" of this Lease shall begin at 12:01 a.m. on the earlier to occur of the following dates under clauses (a) or (b), which date shall be the "Term Commencement Date":
>
> > (a) the date on which Tenant first enters into possession of all or any portion of the Premises for the regular conduct of its business; or
> > (b) the Substantial Completion Date (as defined in Exhibit C, if applicable for the Initial Tenant Work to be performed by Landlord pursuant to Exhibit C.

. . . Promptly after the determination of the Term Commencement Date, Landlord and Tenant shall execute and deliver a commencement letter in the form attached as <u>Exhibit D</u> . . .[3]

On June 29, 2018, the Debtor commenced a Chapter 11 case and has been operating as a debtor-in-possession. The Debtor has paid RREF all post-petition rent due since the commencement of its Chapter 11 case.

On or about August 14, 2018, PCA, the architectural firm engaged by Related Beal, issued Construction Documents for "648 Beacon St. Scope of Work Description. In the letter, Jeffrey Gannon, stated: "Based on what we understand today, the proposed work would be classified as 'Level 2' by the exiting building code (MEBC) and constitutes a combination of substantial renovation and cosmetic upgrades." Gannon added:

> The ground floor includes a reconfiguration of the lobby area and total refinishing of that space including signage, lighting, wall, and floor treatments. Adjacent to the lobby a ground floor retail tenant plans to expand and fully renovate its space. All new work will need to comply with the building code for new construction. This work will involve a high level of coordination with existing elements and systems and will be a substantial undertaking within the existing building.

> Levels 2-6 will receive cosmetic improvements to the common corridors and restrooms. There will be a combination of floor, wall and ceiling treatment removal and replacement, coordinated with relevant MEPFP and FA items to remain or be replaced in kind (i.e.- lighting, devices, etc.) and also a finish renovation of the elevators. *While minimal in scope, this work will certainly have impacts from a disruption point of view for any tenants currently occupying those floors.*

> *At level 3, we are doing a comprehensive "gut" renovation of the tenant space in addition to the common area cosmetic improvements.* This requires all new work to comply with the current building code for new construction. There will

---

[3] Exhibit C provided that "Prior to the Term Commencement Date, Landlord shall perform the demising work necessary to demise the Premises as shown on <u>Exhibit</u> A to the Lease, using Building standard materials, quantities and finishes . . . ."

> be some tying in to existing infrastructure outside the tenant space as well.
> Scope consist [sic] of new walls and doors, lights, HVAC including
> mechanical ventilation, and other interior fit-out accommodations.

(emphasis supplied).

On August 9, 2018, Roux issued a hazardous building materials screening survey

("HBM Survey") with respect to the presence of asbestos-containing building materials

(ACBM), lead-based paint (LBP), polychlorinated biphenyls (PCBs), and mercury

containing components.  According to Roux, ACBM were were found in 9" x 9" floor tiles

and associated black mastic adhesive throughout the third floor.  In addition, other

hazardous materials were present, including LBP.

B. The Testimony

At trial two witnesses testified, Alexander Provost ("Mr. Provost"), an employee

of Related Beal overseeing the development of the nine-building portfolio Related Beal

acquired from Boston University in October of 2016 for $14.4 M,  and Siri Karm Singh

Khalsa ("Mr. Khalsa"), the President of the Debtor.   Mr. Provost testified about Related

Beal's development plans, stating that it intended to demolish six of the nine buildings it

acquired from Boston University (i.e., 650, 652-654, and 656 Beacon Street, and 553, 535-

539, and 541 Commonwealth Avenue).  Mr. Provost described 648 Beacon Street as a six-

story building with approximately 48,000 square feet that was built between 1940 and

1960.  He indicated that it was originally built as a car dealership and thus contains

structural steel components.  Mr. Provost testified that the Building was "quite dated,"

adding that the exterior stone needs to be repointed and the windows need to be replaced.

He also testified that interior was outdated and that asbestos and PCBs were present.

11

According to Mr. Provost, when Related Beal purchased the Building, Boston University was the primary tenant, occupying floors 2, 4, 5, and 6 and that it executed a short term lease with Boston University for that space as the existing lease had just recently expired.  With respect to the remaining floors, Mr. Provost testified:

> On the third floor was The Boston Language Institute. They [sic] occupied the entirety of the third floor. And then moving down to the first floor really broken up into four different spaces, one being the main office lobby to access the second through sixth floor, as well as two retail spaces, one belonging to Bruegger's Bagels and one belonging to the Amsterdam Falafelshop. And then in the back of the building was the Boston University student newspaper, The Daily Free Press, on the first floor, so a total of five tenants, but, you know, while there were different institutions within BU, BU was the lessee of the space.

According to Mr. Provost, Bruegger's Bagels and the Falafelshop have vacated the building.

Provost described the plans for 648 Beacon Street as involving "the fit-out or build-out of our construction office, which we will be using during the portion of time that we will be building new components next door."  He added:

> We will also be building a marketing suite in order to provide flexibility during that time. We are also build -- demolishing some significant portion of the first floor to bring the retail portions of the building back to where *The Daily Free Press* were [sic] as well as extending the lobby substantially and refinishing the lobby, the elevator cabs, and all of the common corridors up through the building which have been, you know, the same since the '70s or '80s to kind of bring it up to more of a 21st Century office space.

Mr. Provost testified that PCA, the architectural firm engaged by Related Beal, was to explore "re-subdivision" of the ground floor for retail purposes and the second floor for a potential office tenant moving from one of the buildings that is being demolished." With respect to the third floor, he testified that PCA was to going to look at it "to create

12

a marketing suite for Related Beal's purposes."   According to Mr. Provost, PCA has

produced design and construction documents and submitted invoices to Related Beal.

Mr. Provost also indicated that Related Beal had engaged a mechanical engineer for the

installation of new plumbing, electrical, and HVAC systems.   In addition, Related Beal

has engaged Roux to investigate the presence of hazardous materials and to plan for any

remediation, as well as a general contractor, Corderman & Company.   He disclosed that

Roux, as noted in its August 9, 2018 letter, discovered the presence of asbestos in the

mastic, the adhesive used to lay carpet or linoleum tiles, as well as PCBs and lead-based

paint.

Mr. Provost testified about the effect of the continued presence of the Boston

Language Institute on the premises as follows:

> to our understanding the tenant has several students who come through
> the building all day long. We do have a lot of work going on within the
> common spaces of the building that they would use to access elevators,
> access the lobby, access their specific tenant space. However, there also is a
> large amount of demolition that will be happening, not only on the tenants'
> floor but also below and, you know, really our first step would be going in
> and removing a lot of those hazardous materials that would need to be
> removed before we would realistically allow another tenant to come into
> the building.

Mr. Provost also testified about the January 26, 2018 letter from Related Beal to the Boston

Redevelopment Authority in which it described the Proposed Project as involving

"modest modifications to Buildings 1 and 9 to provide improvement to the streetscape as

well as interior improvements to the office and commercial retail/restaurant space."   He

stated:   "the word 'modest' or 'modest modifications' was merely to let the public

understand that that is not – you know, it is modest in comparison to a demolition and new construction for -- you know, to 60 to 80 million-dollar buildings next door."

With respect to the lease with JVPT, Mr. Provost explained that that entity leased space in two of the buildings that Related Beal intends to demolish.  He further explained that Related Beal was "trying to accommodate them at one of the other buildings that will not be coming down, but that they can continue to occupy space within their building until the building comes down and then hopefully transition them over to one of the buildings that is not being demolished."  He added:

> The way it's structured is that they would not be paying rent for six months in order to leave them six months to fit out the project, which kind of coordinates with our construction or at least our proposed plan to begin work within the building. So the way we worked it out with them was our contractor would likely be doing all of the other work on the third floor, first floor and the common spaces on all the floors, but also their subdivision and tenant fit-out on the second floor during that same period of time.

Mr. Provost concludes that the Notice of Termination sent to the Debtor on June 28, 2017 was based on a good-faith determination that substantial rehabilitation would occur in the building.

On cross-examination, counsel to the Debtor asked Mr. Provost how he could reconcile the "substantial rehabilitation" referenced in the June 28, 2017 Notice of Termination of Lease and Tenant's Right to Possession with the January 26, 2018 letter to the Boston Redevelopment Authority in which Related Beal referenced "modest modifications" to 648 Beacon Street, as well as the project description employed by PCA for Building 9 which was prepared in March of 2018 and referenced "no alterations or

14

updates to existing tenant spaces."  He responded:  "That is a component of substantial renovation."  Mr. Provost was asked whether those descriptions were intended to appeal to neighborhood entities that were concerned about a major demolition project.  Mr. Provost stated:

> This was to differentiate the review process for the Buildings 2 through 8 versus Buildings 1 through 9 [sic]. When we say "modest" it is due to a threshold which triggers that review process. You know, we currently plan to spend five million dollars within Building 1 [sic], which we believe is a substantial renovation as well. However, it does not trigger an entitlement permitting process like the buildings when they are coming down and you are spending much more than the building value on a new -- the new construction of those buildings.

On cross-examination, counsel to the Debtor also asked Mr. Provost whether the Notice of Termination of Lease was a pretext to avoid an unfavorable lease because the Debtor's base rent per square foot was $25 while the base rent in the lease contemplated with JVPT was $53 per square foot.  Mr. Provost admitted that there was a substantial increase in the rental obligations under the new lease, but, nevertheless, testified that there would be substantial rehabilitation of the lobby space and the entire building.

Mr. Provost also admitted that Related Beal was in discussions with an entity planning to open a restaurant known as Cornwall's on the first floor of 642-648 Beacon Street.  The restaurant would have its own separate entrance between the existing lobby entrance and common areas affording access to the six floor offices, including the Debtor's third floor space, and new retail space which also would have separate access.  Mr. Provost admitted that the planned demolitions had nothing to do with the plans for 648 Beacon Street.

Mr. Khalsa testified that the Debtor has been in business for 21 years.  Occupying 7,745 square feet of space on the third floor of 648 Beacon Street, it provides foreign language instruction to approximately 175 people per day, as well as translation services in many languages.  He testified that the Debtor was "part of the lifeblood of the Kenmore Square."  Nevertheless, he admitted that the Debtor's business suffered a downturn in 2017 owing to dramatically increased competition.  Mr. Khalsa indicated that, as a consequence, he caused the Debtor to take out some merchant lender loans with onerous terms, resulting in some rent arrears.

Mr. Khalsa testified that the Debtor has had the same Lease, subject to amendments, since 1997 when it executed the Lease with One Kenmore Centre Limited Partnership.  Mr. Khalsa explained that Boston University became the Debtor's Landlord prior to the execution of the First Amendment to Commercial Lease and that, as president of the Debtor, he had a cordial relationship with Boston University.  Moreover, Boston University affiliated entities occupied several floors of the building, including its Department of Psychology.

Mr. Khalsa testified that students utilize a separate entrance to the lobby to obtain access to elevators and the Debtor's facilities on the third floor, and anyone entering the restaurant spaces formerly occupied by Bruegger's Bagels and the Falafelshop had to use separate entrances.

Mr. Khalsa further testified about his view of the genesis of the Lease Termination provision set forth in paragraph 3 of the First Amendment to Commercial Lease,

specifically, the meaning of "substantially rehabilitate all or any substantial portion of the Building (two or more floors)." He explained:

> [T]he words we used in the conversation were gut two complete floors in the building minimally before -- that they had determined to do that before they had the -- they could issue a 12-month notice. . . . There was concern that the psychology department wanted our space to demand. And so it was written so that they couldn't do that.

Mr. Khalsa also testified that the lobby was not considered one of the floors as "[i]t's a long empty hallway leading to the elevators with some rooms at the back" and that [i]t was always Floors 2 to 6 that we were talking about." He added that Bruegger's Bagels and the Falafelshop were not considered to be located on one of the floors subject to paragraph 3, stating "[i]t never entered into our minds."

Mr. Khalsa further testified that he had discussions regarding the Lease with representatives of RREF in which he learned that the Landlord was contemplating $65 per square foot for base rent. In addition, he confirmed that he was aware of a lease for the second floor with a base rent obligation of $53 per square foot. Accordingly, he testified that he considered the Debtor's leasehold interest to be "a very important asset" that also would be important for its plan of reorganization. Mr. Khalsa elaborated, testifying that the Debtor was in discussions with a potential investor from China, as well as with various lenders. He also testified that he was prepared to sell the Debtor's business.

Mr. Khalsa opined that a build-out of the other floors could be accomplished without "aggravating" the Debtor's clients, teachers, and other employees or visitors. He conceded, however, that he lacked knowledge about the removal of hazardous materials.

17

In addition, he acknowledged that the Debtor was searching for alternative rental space within which to operate and had a potential agreement to move to 540 Commonwealth Avenue, Boston, Massachusetts, a location across the street from its existing location.

Mr. Provost, in rebuttal, examined architectural plans prepared by PCA, including demolition plans for the first floor. Mr. Provost admitted that the existing plans provided for gutting only the third floor, although other floors would be gutted in the future. Moreover, he acknowledged that Related Beal wished to occupy the third floor and that floors 2 and 4-6 are to receive only cosmetic improvements.

## III. POSITIONS OF THE PARTIES

### A. RREF

RREF maintains that it has hired consultants and taken measures to cause the building to be vacant for purposes of preparing for substantial rehabilitation. It points to 1) a Lease Termination Agreement with 642 Beaconaf, LLC, which occupied a portion of the first floor, space that is now vacant; 2) a Notice to Quit directed to Back Bay Publishing which occupied a small portion of the first floor which is now vacant; and 3) a Notice of Termination sent to Bruegger's Enterprises, Inc., resulting in a vacancy of the first floor space it occupied. It adds:

> The rehabilitation of the 648 Beacon Street Building will be extensive and substantial. Mr. Provost testified that the work proposed for the floors in the Building is budgeted initially at $3.5 million dollars, with a likely $4 to $5 million "down the road." The rehabilitation includes but is not limited to a reconfiguration of the ground floor which includes a reconfiguration of the lobby area and total refinishing of that space including signage, lighting, wall, and floor treatments. Adjacent to the lobby a ground floor retail tenant plans to expand and fully renovate its space. All new work will need to comply with the building code for new construction. This work will

involve a high level of coordination with existing elements and systems and will be a substantial undertaking within the existing building.

RREF contends floors 2 through 6 will be improved with upgraded common corridors, restrooms, and elevators, as well as removal and replacement of floors, walls, and ceiling treatments with attention to hazardous materials that are present in the building.  With respect to the third floor, it references a "a comprehensive 'gut' renovation of the tenant space," with new walls, doors, lights, HVAC and other interior fit-out accommodations.

RREF recognizes the following:

> The interior renovations to 648 Beacon Street are an important component of the overall Project. Compared to the demolition or exterior renovation of other buildings in the project as a whole (which renovations are currently being reviewed by the Boston Planning Department as a "large project" under Article 80 of the Boston Zoning Code), the rehabilitation of 648 Beacon Street is more modest (as referenced in Related Beal's January 26, 2018 letter to the Boston Planning & Redevelopment Agency) . . . but the work being planned and implemented is nevertheless and clearly substantial.

RREF in support of its Lift Stay Motion references evidence of expenses it has incurred, proposals it has received for architectural works, environmental studies, and hazardous material surveys.  In particular, it cites the Roux proposal and the PCA construction documents.  It states:

> The Plans contemplate substantial rehabilitation of the first and third floors, as well as substantial rehabilitation of other floors including for work to be performed involving but not limited to the remediation of hazardous materials at the Building's floors. Among the work items for the first floor alone, for example, are the removal of an "entire wall from floor to underside of deck," another partial wall, the existing ceiling, an entire storefront system; and demolition of wall finish/wallboard" . . . .

With respect to Roux's Building Materials Inspection, RREF emphasizes the presence of ACBM in floor title, carpet mastic adhesive, window caulking, window glazing and elsewhere on all floors and that removal of those materials must precede renovation and demolition work. RREF also notes the presence of lead paint throughout the site and PCBs in window glazing compounds. RREF concludes that the building must be vacant to undertake the remediation work.

With respect to the JVPT lease, it states:

RREF has had drafted [sic] an Office Lease Agreement with JVPT for potential occupancy of 3,750 square feet on the second floor of the Building "SUBJECT TO CONFIRMATION UPON FINALIZATION OF LAYOUT PLAN." (Emphasis in Draft Lease, 1.03.) . . . The Term Commencement Date is the earlier of when Tenant first enters possession of the Premises for the regular conduct of its business or the Substantial Completion Date of the work set forth in Exhibit C to the proposed Lease. . . . The Rent Commencement Date is not until one-hundred eighty days after the Term Commencement Date.

RREF also challenges the Debtor's evidence to its prospects of reorganization. It argues that the Debtor has failed to obtain permanent financing and that Mr. Khalsa's testimony about a potential investor reveals that the existence of such an investor is illusory. It contends that its failure to secure substitute premises or to secure financing undermine the Debtor's argument that a plan is likely to be successful.

Citing <u>Barclays Bank PLC v. Poynter</u>, 710 F.3d 16, 21 (1st Cir. 2013) (applying Massachusetts law), RREF maintains that it has established that substantial rehabilitation of the building is underway, asserting that "'[a]mbiguity . . . is not created just because the parties disagree about the contract's meaning.'" <u>Id.</u> It adds that "with an initial budget of approximately $3.5 million dollars, a substantial rehabilitation of the Building

will occur within the common and ordinary meaning of those words." It also argues that

nothing in the First Amendment to Commercial Lease excludes the first floor from the

"two or more floors" requirement.   Citing <u>Lunder v. Atsco Footwear, LLC</u>, C.A. No.

SUCV201103005BLS2, 2012 WL 2913505, at *4 (Mass. Super. Ct. April 23, 2012), it

contends, in its words, that the Debtor's "reliance on a selfserving [sic] understanding or

oral statements in an attempt to defeat a contractual obligation . . . is not reasonable as a

matter of law when the understanding or oral statement alleged conflicts with writings

which are clear, plain, and obvious."   Finally, it contends that the proposed rehabilitation

is substantial even under the Debtor's understanding of RREF's termination rights, citing

<u>E. Pork Prods. Co. v. N.Y. State Div. of Hous. & Cmty. Renewal</u>, 590 N.Y.S.2d 77, 80, 187

A.D.2d 320, 323 (1992); and <u>Nelson v. Yates</u>, 485 N.Y.S.2d 412, 127 Misc. 2d 234, 237 (1984).

   RREF concludes by asserting that it is entitled to relief from the automatic stay for

"cause" under § 362(d)(1), because

> RREF is attempting to complete a true and significant restoration of a
> former good quality, with both the third floor and the first floor work
> involving demolition plans, with the second floor having a major tenant
> space being reconstructed, with corridor, elevator bank and elevator lobby
> work on all floors, and, significantly, hazardous materials throughout the
> Building being removed and remediated, all for a project cost of several
> million dollars. This is therefore a multi-million dollar, substantial
> rehabilitation justifying the notice of termination provided to BLI [the
> Debtor] more than a year ago.

RREF also contends that the Debtor cannot show that a plan is likely to succeed and that

the Lease is not necessary to an effective reorganization, particularly because it avers the

Debtor can locate comparable rental space elsewhere, adding the Premises are not unique

or irreplaceable.

B. <u>The Debtor</u>

According to the Debtor, RREF issued conflicting statements regarding the Debtor's Premises, noting the following:

> On January 26, 2018, RREF's affiliate Related Beal sent the Boston Redevelopment Authority a Letter of Intent filed in accordance with the Executive Order Relative to the Provision of Mitigation by Development Projects in Boston. That letter states that with respect to 648 Beacon Street, Boston, MA ("Building 9") its proposed project "as currently envisioned includes: (1) *modest modifications* (emphasis added) … to provide improvement to the streetscape as well as interior improvements to the office and commercial retail/restaurant spaces.

The Debtor also points to PCA's architectural proposal in which it proposed to update finishes but proposed "no alterations to the existing tenant spaces" and "no alterations or updates to the building exterior."

In addition, the Debtor relies upon a value of $53 per square foot as the value of its lease hold interest based upon the JVPT Letter of Intent for the second floor, resulting in a value of $820,000 for 24 months.  In addition, Mr. Khalsa testified that RREF offered to re-let the Premises to it for $55 per square foot.

The Debtor argues as follows:

> Notwithstanding RREF's purported Notice of Termination Letter of June 28, 2017 that it had determined that to "to demolish or substantially rehabilitate all or any substantial portion of the Building (two or more floors), the evidence, both testimonially [sic] and in the stipulated facts shows that RREF made completely contradictory statements to the BRA on January 26, 2018 . . . and the March 1, 2018 architectural proposal from PCA it had requested . . . . That architectural proposal, in particular clearly demonstrates that the Movant, as of the June 26, 2017 purported termination letter had NOT made the required determination in order to trigger the relevant clause of the lease. A reasonable inference is that RREF was engaged [in] an attempt [to] rid itself of an under-market lease.

The Debtor further argues that RREF only introduced evidence of "recent (post-petition) documentation to support its "substantial rehabilitation" contention, concluding that "RREF had clearly not determined to substantially rehabilitate two or more floors as required under the termination clause of the First Amended Lease." Thus, the Debtor concludes:

> The term "substantial rehabilitation" is defined in the termination option of the First Amended Lease as (two or more floors). The words otherwise should be interpreted in accordance with ordinary English language meanings. In addition to being contradicted by the term "modest" in the BRA letter and the minimal scope of work in the PCA proposal . . . , since floors 2-6 are not contemplated to be rehabilitated, it is impossible for RREF to exercise the termination option, however defined.

Finally, the Debtor contends that Mr. Khalsa's testimony that the Lease is necessary for an effective reorganization was unrebutted. Accordingly, in its view, RREF's Motion must be denied pursuant to §362(d)(2)(B) and that because the Debtor is paying post-petition rent at the contract rate, RREF's interest in the Lease is adequately protected.

## IV. DISCUSSION

### A. Applicable Law

Section 362(d) provides in relevant part:

(d) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay —

(1) for cause, including the lack of adequate protection of an interest in property of such party in interest;

(2) with respect to a stay of an act against property under subsection (a) of this section, if —

> (A) the debtor does not have an equity in such property; and
>
> (B) such property is not necessary to an effective reorganization . . . .

11 U.S.C. § 362(d).  Section 362(g) provides: "In any hearing under subsection (d) or (e) of this section concerning relief from the stay of any act under subsection (a) of this section— (1) the party requesting such relief has the burden of proof on the issue of the debtor's equity in property; and (2) the party opposing such relief has the burden of proof on all other issues."

### 1. Hearings Under § 362(d)

According to the United States Court of Appeals for the First Circuit in <u>Grella v. Salem Five Cent Savs. Bank</u>, 42 F.3d 26 (1st Cir. 1994), "a hearing on a motion for relief from stay is merely a summary proceeding of limited effect." <u>Id.</u> at 33 (citations omitted). The First Circuit added:

> [A] court hearing a motion for relief from stay should seek only to determine whether the party seeking relief has a colorable claim to property of the estate. The statutory and procedural schemes, the legislative history, and the case law all direct that the hearing on a motion to lift the stay is not a proceeding for determining the merits of the underlying substantive claims, defenses, or counterclaims. Rather, it is analogous to a preliminary injunction hearing, *requiring a speedy and necessarily cursory determination of the reasonable likelihood that a creditor has a legitimate claim or lien as to a debtor's property*. If a court finds that likelihood to exist, this is not a determination of the validity of those claims, but merely a grant of permission from the court allowing that creditor to litigate its substantive claims  elsewhere without violating the automatic stay.

<u>Id.</u> at 33–34 (emphasis added, footnote omitted).

2. § 362(d)(1)

"Lack of adequate protection" constitutes "cause" for relief from stay under 11 U.S.C. § 362(d)(1), but, as the court in In re Guzman, 513 B.R. 202, 208–09 (Bankr. D. P.R. 2014), stated, "there are other bases for a cause finding." Id. at 208 (citing Alan N. Resnick and Henry J. Sommer, 3 Collier on Bankruptcy ¶ 362.07[3] (16th ed. 2013)). "'Cause' is an intentionally broad and flexible concept which must be determined on a case-by-case basis." See In re Project Orange Assocs., LLC, 432 B.R. 89, 103 (Bankr. S.D.N.Y. 2010) (citing In re Brown, 311 B.R. 409, 412–13 (E.D. Pa. 2004)). What constitutes "cause" has evolved through case law. Goya Foods, Inc. v. Unanue–Casal (In re Unanue–Casal), 159 B.R. 90, 96 (D. P.R. 1993), aff'd, 23 F.3d 395 (1st Cir. 1994). Not infrequently, courts find "cause" for relief from stay where a movant seeks permission to litigate in another forum, as is the case here where RREF seeks to commence eviction proceedings against the Debtor.

There is no consistent definition of "cause" that has been uniformly adopted by the the United States courts of appeal. The circuits have adopted different balancing tests to determine whether cause exists. Courts in the Second Circuit frequently apply the twelve-part Curtis test, see Sonnax Indus. Inc. v. Tri Component Prods. Corp. (In re Sonnax Indus., Inc.), 907 F.2d 1280, 1285-86 (2d Cir. 1990) (citing In re Curtis, 40 B.R. 795, 799-800 (Bankr. D. Utah 1984)),[4] while courts in the Seventh Circuit favor the three-part

---

[4] Those Curtis factors include:

(1) whether relief would result in a partial or complete resolution of the issues; (2) lack of any connection with or interference with the bankruptcy

Football Weekly test, *see* Int'l Business Machines v. Fernstrom Storage and Van Co. (In re

Fernstrom Storage and Van Co), 938 F.2d 731 (7th Cir. 1991) (citing In re Pro Football

Weekly, Inc., 60 B.R. 824, 826 (N.D. Ill. 1986)).[5]  *See also* Robbins v. Robbins (In re Robbins),

964 F.2d 342, 345 (4th Cir. 1992) (citing, inter alia, Football Weekly).   The United States

Court of Appeals for the First Circuit Court has not adopted a particular test, but courts

in the First Circuit have applied the three-part Football Weekly test to determine cause.

*See, e.g.,* TSJ, Inc. v. Wang Labs, Inc., (In re Wang Labs., Inc.), No. 93-11325-MLW, 1996

---

case; (3) whether the other proceeding involves the debtor as a fiduciary;
(4) whether a specialized tribunal with the necessary expertise has been
established to hear the cause of action; (5) whether the debtor's insurer has
assumed full responsibility for defending it; (6) whether the action
primarily involves third parties; (7) whether litigation in another forum
would prejudice the interests of other creditors; (8) whether the judgment
claim arising from the other action is subject to equitable subordination; (9)
whether movant's success in the other proceeding would result in a judicial
lien avoidable by the debtor; (10) the interests of judicial economy and the
expeditious and economical resolution of litigation; (11) whether the parties
are ready for trial in the other proceeding; and (12) impact of the stay on the
parties and the balance of harms.

In re Curtis, 40 B.R. at 799-800.

[5] The Football Weekly factors are:

a) Any great prejudice to either the bankrupt estate or the debtor will result
from continuation of the civil suit,

b) the hardship to the [non-bankrupt party] by maintenance of the stay
considerably outweighs the hardship of the debtor, and

c) the creditor has a probability of prevailing on the merits.

In re Pro Football Weekly, 60 B.R. 824, 826 (N.D. Ill. 1986).

WL 87050, at *5 (D. Mass. 1996); In re Hurvitz, 554 B.R. 35, 40 (Bankr. D. Mass. 2016); In

re Haines, 309 B.R. 668, 674 (Bankr. D. Mass. 2004).

           3. § 362(d)(2)

      In United Sav. Assoc. of Texas v. Timbers of Inwood Forest Assocs., Ltd, 484 U.S.

365, 108 S.Ct. 626 (1988), the Supreme Court stated:

> Once the movant under § 362(d)(2) establishes that he is an undersecured
> creditor, it is the burden of the debtor to establish that the collateral at issue
> is "necessary to an effective reorganization." See § 362(g). What this requires
> is not merely a showing that if there is conceivably to be an effective
> reorganization, this property will be needed for it; but that the property is
> essential for an effective reorganization that is in prospect. This means, as
> many lower courts, including the en banc court in this case, have properly
> said, that there must be "a reasonable possibility of a successful
> reorganization within a reasonable time." In re Timbers of Inwood Forest
> Associates, Ltd., 808 F.2d 363, 370–371 nn. 12–13 (5th Cir. 1987), and cases
> cited therein. The cases are numerous in which § 362(d)(2) relief has been
> provided within less than a year from the filing of the bankruptcy petition.
> And while the bankruptcy courts demand less detailed showings during
> the four months in which the debtor is given the exclusive right to put
> together a plan, see 11 U.S.C. §§ 1121(b), (c)(2), even within that period lack
> of any realistic prospect of effective reorganization will require § 362(d)(2)
> relief.

484 U.S. at 375–76, 108 S.Ct. 626 (footnotes omitted). In In re BB Island Capital, LLC, 540

B.R. 16 (Bankr. D. Mass. 2015), aff'd, BB Island Capital, LLC v. E. Boston Savs. Bank (In re

BB Island Capital, LLC), No. 15-13105-JNF, 2015 WL 8512862 (D. Mass. Dec. 11, 2015), this

Court observed:

> Since the Timbers of Inwood, decision courts have attempted to
> particularize this standard. The Ninth Circuit Bankruptcy Appellate Panel
> has embraced a four-part test first articulated in In re Holly's, Inc., 140 B.R.
> 643, 700 (Bankr. W.D. Mich. 1992), which describes the debtor's burden of
> proof as a "moving target which is more difficult to attain as the Chapter 11
> case progresses." See, In re Sun Valley–Newspapers, Inc., 171 B.R. 71, 75 (9th
> Cir. BAP 1994). The Holly's, court separated the burden of proof into four

distinct stages based on when the creditor seeks relief: "The four broad categories can be stated as follows: (1) is it plausible that a successful reorganization will occur within a reasonable time?; (2) is it probable that a successful reorganization will occur within a reasonable time?; (3) is it assured that a successful reorganization will soon occur?; or (4) is it impossible that a successful reorganization will occur within a reasonable time?" Holly's, 140 B.R. at 700 (emphasis original); *see also*, Sun Valley Newspapers, Inc., 171 B.R. at 75.

Holly's, teaches us that the standard articulated in Timbers of Inwood, imposes an increasing burden of proof on the debtor regarding the viability of reorganization as a means of balancing a debtor's need to reorganize against the delay, and consequent harm, imposed on creditors by the stay. Initially the balance favors the debtor in possession. But the burden of proof rapidly shifts in favor of secured creditors, requiring a heightened showing by the debtor of its chances for reorganization. Immediately after the case is filed, a debtor in possession opposing stay relief may offer a "less strenuous" showing of "a reasonable possibility of successful reorganization within a reasonable time." During this stage, the debtor sustains the burden of proof by offering sufficient evidence that a successful reorganization within a reasonable time is "plausible." The standard is low, requiring the debtor only to present evidence that is "superficially worthy of belief" that it is capable of producing a plan. The terms of the plan can be obscure and vague, as long as it is plausible that a successful reorganization may occur. The bankruptcy court's mandate is to balance the reasonableness of the delay borne by the secured creditors against the debtor's ability to formulate a plan. Immediately after the case is filed, if the debtor presents any evidence that a confirmable plan is plausible, the balance favors the debtor and the creditors are expected to wait while the debtor attempts to craft a plan. Holly's, 140 B.R. at 701.

In re BB Island Capital, LLC, 540 B.R. at 22-23 (quoting In re Souza, No. 12–13341, 2012

WL 8441318, at *3 (Bankr. E.D.Ca. Nov. 26, 2012).  This Court, in BB Island Capital, LLC,

added:

"When the exclusivity period has not yet run, courts apply a lesser standard of proof "to benefit debtors who have a realistic chance of reorganization but who have not had sufficient time to formulate a confirmable plan." In re Morton, No. 3:15–bk–30892, 2015 WL 4396719 at *4 (Bankr. E.D. Tenn. July 17, 2015) (quoting Am. Network Leasing, Inc. v. Apex Pharm., Inc. (In re Apex Pharm., Inc.), 203 B.R. 432, 442 (N.D. Ind.1

28

996) ("During the early stages of a bankruptcy case, the court 'must work with less evidence than might be desirable and should resolve issues in favor of the reorganization where the evidence is conflicting' to ensure that the debtor is given the 'breathing room' Congress intended the stay to provide.").

In re BB Island Capital, LLC, 540 B.R. at 23.

B. Analysis

Based upon the evidence presented, the Court concludes that at this time RREF and Related Beal intend a substantial rehabilitation of the building located at 642-648 Beacon Street in conjunction with its plans to demolish and redevelop a block of buildings in Kenmore Square.  The exhibits submitted at the evidentiary hearing and the testimony discussed above establish that both the first and third floors will undergo substantial rehabilitation.  The rehabilitation of the first floor areas formerly occupied by Bruegger's Bagels and the Falafelshop, however, will not affect the Debtor as access to those spaces is via separate entrances.

The building unquestionably is outdated and in need of both cosmetic and environmental rehabilitation, particularly because of the existence of hazardous materials present in the flooring, windows and elsewhere.  Nevertheless, RREF's present position that it intends to gut the third floor occupied by the Debtor is a recent contrivance, particularly where it referenced "modest modifications" in the January 26, 2018 letter to the Boston Redevelopment Authority and the absence of alterations or updates to existing tenant spaces in PCA's March 1, 2018 proposal.  Accordingly, the Court is unconvinced by Mr. Provost's testimony about the scope of the planned rehabilitation of the building

and the removal of hazardous materials where Related Beal has its eye on the third floor

space for its own use.

Although the court observed in E. Pork Prods. Co. v. N.Y. State Div. of Hous. &

Cmty. Renewal,

> The words "substantially rehabilitated" in ETPA § 5 (a) (5) are not technical
> terms, but are rather general, commonly used terms which may not be
> limited by judicial or administrative construction, and should be accorded
> their commonly understood meaning. . . . Reference to definitions
> contained in Webster's Third New International Dictionary Unabridged
> generally suggests "a true or significant restoration of a former good
> quality" to the subject building (Nelson v Yates, 127 Misc 2d 234, 237). If the
> Legislature had intended to require "the gutting of the entire interior of the
> building" while all apartments and rooms are vacant in order for the
> exception to apply, as DHCR ruled in its April 20, 1990 determination of the
> PAR, the Legislature could easily have so specified (see, Pape v Doar, 160
> AD2d 213, 215; Matter of Board of Educ. v State Div. of Human Rights, 38
> AD2d 245, 248, affd 33 NY2d 946).

E. Pork Prods. Co., 187 A.D.2d at 323, the Court concludes in this case substantial

rehabilitation of 648 Beacon Street was not contemplated before the Debtor filed its

bankruptcy petition.    Rather, Related Beal contemplated minor modifications to the

building and no alterations to the Debtor's third floor space.    Related Beal targeted the

Debtor's space for use as a construction and sales office and expressed an intent to gut

the third floor only after the commencement of the case in order to rid itself of a below

market rate lease.

In In re Haines, this Court determined that the three-part test set forth in In re

Fernstrom Storage and Van Co., 938 F.2d 731 (7th Cir.1991), namely the Football Weekly

test, provided "useful guidance."    309 B.R. at 674.    Applying that test here, the Court

concludes that the Debtor would be greatly prejudice if it were required to defend an

eviction proceeding during the very early stages of its reorganization and the hardship

to the Debtor outweighs the hardship to the Landlord at this juncture in the bankruptcy

case.   Moreover, the Court concludes that RREF has taken steps to implement its

rehabilitation of 642-648 Beacon Street and has a probability of prevailing on its claim

that the Notice of Lease Termination was valid.   Nevertheless, when considering the

factors set forth by the court <u>Fernstrom</u> and weighing the harm to the parties, the Court

concludes that the balancing test favors the Debtor, although that balance may shift in

favor of RREF if the Debtor is unable to submit a viable Chapter 13 plan and as RREF and

Related Beal proceed with the extensive development of its Kenmore Square holdings.

The Debtor is affording RREF adequate protection in the form of on-going

monthly rental payments, *see* <u>In re Sweet N Sour 7th Ave. Corp.</u>, 431 B.R. 63 (Bankr.

S.D.N.Y. 2010) ("'The failure to pay post-petition rent may also serve as grounds for

lifting the automatic stay.' The Landlord will . . . not be adequately protected if the Debtor

falls behind in postpetition rent." (citations omitted)).   The payment of its existing rental

obligations as required by 11 U.S.C. § 365(d)(3) is providing RREF adequate protection

for now.

With respect to RREF's request for relief under § 362(d)(2), RREF submitted no

specific evidence as to the Debtor's equity in the Lease, although given its position

regarding the Lease Termination and the expiration of the Lease in 2020, the Court can

infer that it believes the Lease has no value.   The Debtor, at this stage of its case, has

established that an effective reorganization is in prospect.   Mr. Khalsa testified that he

was exploring all options, including obtaining a new lease for premises across the street

from 648 Beacon Street, obtaining an infusion of capital, or selling the business. The Debtor has been a debtor-in-possession for approximately four months. Within that time, it has engaged a certified public accountant and obtained Court authority to use cash collateral on an interim basis through January 15, 2019. Accordingly, under the standard set forth in In re Souza, 2012 WL 8441318 at *3; and In re Morton, 2015 WL 4396719 at *4, the Court concludes it has established a likelihood of reorganization. Absent continuing progress, however, the Debtor's ability to satisfy the standard set forth by the United States Supreme Court in Timbers, 484 U.S. at 375–76, will be in jeopardy.

The adequate protection offered by the Debtor and its existing plans for reorganizing cannot insulate the Debtor from the Notice of Termination of Lease and, more importantly, the expiration of the stated term of the Lease in 2020. In other words, even accepting the Debtor's position that RREF's Notice of Lease Termination was a pretext for ridding itself of an unfavorable lease, the Debtor cannot occupy the third floor of 648 Beacons Street after the expiration of the stated term of its Lease unless it negotiates a new lease with RREF.

Under all these circumstances, the Court concludes that RREF has not set forth a colorable claim to relief at this time. Because the Debtor is providing RREF with adequate protection and has demonstrated a commitment to an effective reorganization, the Court denies RREF's Stay Relief Motion without prejudice to renewal in the event the Debtor fails to file a plan of reorganization and disclosure statement on or before February 15, 2019.

**V. CONCLUSION**

In view of the foregoing, the Court shall enter an order denying the Stay Relief

Motion.

By the Court,

Joan N. Feeney
United States Bankruptcy Judge

Dated:  November 13, 2018